## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Johnny Thomas, | | Case No. 3:21cv1882 |
| | Petitioner, | |
| -vs- | | JUDGE PAMELA A. BARKER |
| | | Magistrate Judge Jennifer Dowdell Armstrong |
| Chae Harris,[1] Warden, | | |
| | Respondent | MEMORANDUM OPINION AND ORDER |

This matter is before the Court upon the Report & Recommendation ("R&R") of Magistrate Judge Jennifer Dowdell Armstrong (Doc. No. 16), which recommends that Petitioner Johnny Thomas's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 be denied. Petitioner has filed Objections to the R&R. (Doc. No. 25.) For the following reasons, Petitioner's Objections (Doc. No. 25) are OVERRULED, the Report & Recommendation (Doc. No. 16) is ADOPTED as set forth herein, and the Petition (Doc. No. 1) is DENIED.

## I.    Summary of Facts

Thomas's habeas petition challenges the constitutionality of his convictions and sentences for two counts of Trafficking in Heroin within 1,000 feet of the boundaries of a school, in the case of *State v. Thomas,* Marion County Court of Common Pleas Case No. Case No. 2019 CR 0301. The state appellate court set forth the facts regarding Thomas's conviction as follows:

> {¶2} On June 26, 2019, Thomas was indicted for two counts of Trafficking in Heroin within 1,000 feet of the boundaries of any school premises in violation of R.C. 2925.03(A)(1), both felonies of the third degree. The first count alleged that Thomas

---

[1] Petitioner is currently incarcerated in the Warren Correctional Institution.  (Doc. No. 24.) Chae Harris is the Warden of that Institution and is, therefore, substituted as the proper party Respondent.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 434-435 (2004).

sold 1.3 grams of heroin to a confidential informant ("CI") during a controlled buy within 1,000 feet of an elementary school on May 15, 2019. The second count alleged that Thomas sold 5.01 grams of heroin to a CI during a controlled buy within 1,000 feet of an elementary school on May 23, 2019. Thomas pled not guilty to the charges.

{¶3} Thomas proceeded to a jury trial on September 19-20, 2019. At trial the State presented evidence that a controlled buy occurred between a CI and Thomas on May 15, 2019, at a park in Marion that was within 1,000 feet of a school. To set up the buy, the CI called Thomas while the CI was with Detective Matthew Baldridge in a vehicle near the park. That call was recorded and played for the jury. Detective Baldridge testified that he was familiar with Thomas's voice and that it was Thomas on the phone making the deal for heroin with the CI. Detective Baldridge testified that he also knew Thomas by the street name "Sonny."

{¶4} Before the buy occurred, Detective Baldridge searched the CI and then provided money for the controlled buy. The CI then left Detective Baldridge's vehicle and walked to the park. Shortly thereafter the CI was observed being picked up by a blue minivan. Another officer, Deputy Stacy McCoy, was nearby conducting surveillance and she saw the CI get into the minivan, which was registered to Thomas. Deputy McCoy took surveillance video of the CI at the park and of the CI getting into the minivan.

{¶5} A short time later the CI exited the blue minivan. Another officer at the scene, Lieutenant Chris Adkins, followed the blue minivan and took some pictures of it. After the buy occurred, Lieutenant Adkins passed the driver of the blue minivan and observed Thomas in the vehicle, who he was familiar with and also knew by the name of "Sonny."

{¶6} Meanwhile, the CI returned to Detective Baldridge and handed over what was later tested and determined to be 1.3 grams, plus or minus .04 grams, which contained heroin, acetyl fentanyl, and fentanyl.

{¶7} Detective Baldridge and the CI conducted a second controlled buy on May 23, 2019. Again the CI made a call to Thomas while the CI was with Detective Baldridge in a vehicle near the specified park and that call was recorded and played for the jury. The CI indicated to Thomas that he wanted to purchase more heroin this time and a deal was set up to be conducted at the same park as before. Detective Baldridge searched the CI and outfitted the CI with audio/visual recording equipment.

{¶8} Once the CI exited Detective Baldridge's vehicle, the CI walked around the general area of the park and waited to meet Thomas. Eventually the blue minivan registered to Thomas came and picked him up. A brief, blurry glimpse of a man in the driver's seat can be seen on the camera footage from the CI. The CI was in the vehicle for less than a minute, then he returned to Detective Baldridge with what was later

2

determined to be 5.01 grams, plus or minus .04 grams, which contained heroin and fentanyl.

{¶9} After the CI exited the blue minivan registered to Thomas, Deputy McCoy followed the van until she saw Thomas stop under an overpass. Deputy McCoy saw Thomas get out of the driver's side door. She testified that she did not see anyone else in the van. The CI did not testify at trial in this case.

{¶10} Through cross-examination of the State's witnesses, and through photographs taken by the police, the defense established that there were some inconsistencies regarding whether anyone else was in the vehicle with Thomas and the CI. For example, regarding the buy conducted on May 23, 2019, Deputy McCoy testified that she did not see anyone else in the minivan when she drove past it, but the CI had told Detective Baldridge that there were other individuals in the van.

{¶11} In addition, Detective Baldridge admitted on cross-examination that while he did search the CI before the controlled buys, it was not a full strip search. Further, through cross-examination the defense established that none of the State's witnesses had eyes on the CI for the entire time during the operation, that none of the State's witnesses actually observed the transaction occur, and that there was no audio or video placed on the CI for the May 15, 2019 controlled buy.

{¶12} Given that the defense seemed to be making an argument through its cross-examination of the State's witnesses that someone else in the blue minivan other than Thomas actually sold the drugs to the CI, the State requested a jury instruction on "complicity," specifically through aiding and abetting. The defense objected to the instruction on complicity but the trial court found that the instruction was appropriate given the evidence presented.

{¶13} The jury returned guilty verdicts on both counts against Thomas as indicted. Thomas was then sentenced to serve 36 months in prison on each count, consecutive to each other, for an aggregate 72-month prison term.

*State v. Thomas*, 2020 WL 6852650 at * 1 – 2 (Ohio App. 3rd Dist. Nov. 23, 2020).

## II.     Relevant Procedural History[2]

### A.      Trial Court Proceedings

---

[2] The Court's recitation of the relevant procedural history is not intended to be exhaustive.  Rather, the Court will set forth only that procedural history necessary to a resolution of the pending Objections.

3

In June 2019, Thomas was indicted by a Marion County Grand Jury on two third-degree felony counts of Trafficking in Heroin in violation of Ohio Rev. Code §§ 2925.03(A)(1) & (C)(6). (Doc. No. 10-1 at PageID# 78.)  On July 1, 2019, Thomas pled not guilty to both charges.  (*Id.* at PageID# 80.)

On September 17, 2019, Thomas filed a Motion to Reveal the identity of the Confidential Informant whom the State alleged had bought drugs from Thomas on May 15, 2019 and May 23, 2019.  (*Id.* at PageID#s 86-88.)  The following day, the State filed a Response in which it indicated that "the State has verbally informed Defendant's counsel of the identity of the confidential informant in this matter."  (*Id.* at PageID# 89.)  The state trial court thereafter denied Thomas' Motion as moot. (*Id.* at PageID# 96.)  *See also* Trial Transcript, Vol. I (Doc. No. 10-2) at PageID# 298.

The matter proceeded to jury trial on September 19, 2019.  (Doc. No. 10-2.)  On September 20, 2019, the jury found Thomas guilty on both counts.  (Doc. No. 10-1 at PageID#s 93-94.)  On October 31, 2019, the state trial court conducted a sentencing hearing.  (Doc. No. 10-1 at PageID#s 101-102; Doc. No. 10-2 at PageID#s 999-1040.)  The trial court sentenced Thomas to a term of thirty-six (36) months on each count to be served consecutively, for a total sentence of seventy-two (72) months (or six (6) years.)  (*Id.*)

**B.**    **Direct Appeal**

On November 8, 2019, Thomas filed a timely appeal of his conviction and sentence in the state appellate court.  (Doc. No. 10-1 at PageID# 100.)  In his appellate brief, Thomas raised the following two grounds for relief:

**First Assignment of Error**:  Appellant's right under the Confrontation Clause of the Sixth Amendment is violated when testimonial evidence of a confidential informant, who does not testify, is introduced during trial thereby violating his rights under the U.S. and State Constitutions.

4

**Second Assignment of Error**: Defendant-Appellant was denied the effective assistance of counsel thereby depriving him of the right to a fair trial under the State and Federal Constitutions.

(*Id*. at PageID#s 105-120.)  On November 23, 2020, the Ohio Court of Appeals for the Third District (hereinafter "state appellate court") affirmed.  *See State v. Thomas,* 2020 WL 6852650 (Ohio App. 3rd Dist. Nov. 23, 2020).  *See also* Doc. No. 10-1 at PageID#s 158-174.  On December 9, 2020, Thomas filed a *pro se* "Motion for Leave to File Instanter Reconsideration," which the state appellate court granted on December 21, 2020.  (Doc. No. 10-1 at PageID#s 175-177.)  On January 22, 2021, the state appellate court issued a Judgment Entry denying Thomas's Motion for Reconsideration.[3] (*Id.* at PageID# 178.)

On February 16, 2021, Thomas, proceeding *pro se,* filed a notice of appeal to the Supreme Court of Ohio.  (Doc. No. 10-1 at PageID#s 186.)  In his Memorandum in Support of Jurisdiction, Thomas raised the following two Propositions of Law:

I.  The appellate court erred in finding Appellant's rights under the confrontation clause of the Sixth Amendment was not violated when testimonial evidence of a confidential informant, who did not testify, is introduced during trial.  Contrary to *State v. Phillips*, 27 Ohio St.2d 294 and *Crawford v. Washington*, 541 U.S. 36, 42 and also *U.S. v. Cromer*, 389 F.3d 662 (6th Cir.)

II.  The appellate court erred in finding appellant was not denied the effective assistance of counsel depriving him of the right to a fair trial under both State and Federal Constitutions.

(*Id.* at PageID# 189) (reproduced as in original).  On April 27, 2021, the Supreme Court of Ohio declined to accept jurisdiction of Thomas's appeal.  (*Id*. at PageID# 219.)  Thomas later filed two

---

[3] Thomas later filed two *pro se* Motions to "Supplement" his Motion for Reconsideration.  (Doc. No. 10-1 at PageID#s 179-184.)  On February 4, 2021, the state appellate court denied both motions.  (*Id*. at PageID# 185.)

Motions to Reconsider, which the Supreme Court of Ohio denied on July 6, 2021.  (*Id*. at PageID#s 220-226.)

### C. Ohio App. Rule 26(B) Application

On February 17, 2021, Thomas filed a *pro se* Application to Reopen his direct appeal pursuant to Ohio Appellate Rule 26(B), alleging that appellate counsel was ineffective for failing to (1) "raise the prejudicial jury instruction on complicity;" (2) "raise trial counsel's cumulative error that deprived appellant a fair trial;" and (3) argue that Thomas's convictions were based on insufficient evidence and against the manifest weight of the evidence.  (Doc. No. 10-1 at PageID#s 227-234.)

On April 7, 2021, the state appellate court denied Thomas' application to reopen his direct appeal, finding that "the three additional assignments of error raised in [his] Application fail to show any genuine issue as to whether he was deprived of the effective assistance of counsel on appeal." (Doc. No. 10- 1 at PageID# 253.)

### D. State Court Habeas Petition

On July 26, 2021, Mr. Thomas filed a Petition for a Writ of Habeas Corpus in the Ohio Supreme Court pursuant to Ohio Rev. Code  § 2725.01.  (Doc. No. 10-1 at PageID#s 255-258.) Thomas raised the following two grounds for relief:

**1.  Confrontation Clause**

Supporting Facts: Petitioner, Johnny Thomas, is unlawfully being held by respondent Kenneth Black in violation of the U.S. Constitution Sixth 6th amend. Under the U.S. Const. Sixth 6th amend. Every person has a legal right to face ones accuser. Petitioner was deprived of that right during trial and was convicted.

**2.  Ineffective assistance of counsel**

Supporting Facts: During trial petitioners trial counsel Caleb Carson failed to

6

> object to the "testimonial heresay" statement that was introduce by the
> prosecutor during trial. Therefore allowing the prosecutor's to introduce
> statements of witnesses who did not appear at trial which deprived petitioner
> of both a fair trial, and effective assistance of counsel, which is governed by
> the U.S. Constitution Sixth 6th amend.

(*Id.* at PageID#257) (reproduced as in original).  On September 14, 2021, the Supreme Court of Ohio

*sua sponte* dismissed Thomas's state habeas petition. (*Id.* at PageID# 270.)

### E.  Federal Court Proceedings

On September 24, 2021,[4] Thomas filed a *pro se* Petition for Writ of Habeas Corpus in this

Court.  (Doc. No. 1.)  Therein, he asserts the following two grounds for relief:

> **Ground One**:  Confrontation Clause.  I was not given any opportunity to face and
> cross examine the person that accused me of the crime in which I was convicted of
> during trial, in violation of the U.S. Constitution.

> **Ground Two**: Ineffective Assistance of Trial Counsel.  Trial Counsel Caleb Carson
> failed to object when the prosecutor introduced the statement of a CI during trial who
> did not appear at trial, also violating by constitutional right to asst. of counsel.

(Doc. No. 1-1 at PageID#s 5-7) (reproduced as in original).  On April 19, 2022, Respondent filed a

Return of Writ, along with the state court record.  (Doc. Nos. 10, 10-1, 10-2.)  Thomas filed a *pro se*

Traverse on May 2, 2022.  (Doc. No. 11.)

On April 17, 2024, the Magistrate Judge issued a Report & Recommendation ("R&R"), in

which she recommended that Thomas's Petition be denied.  (Doc. No. 16.)  The R&R advised the

parties that any objections were due within fourteen (14) days after being served with a copy of the

decision.  (*Id.* at pp. 26-27.)  The docket reflects that a copy of the R&R was mailed to Thomas on

---

[4] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until October 1, 2021, Thomas states that he placed it in the prison mailing system on September 24, 2021.  (Doc. No. 1 at PageID# 15.)  Thus, the Court will consider the Petition to be filed on September 24, 2021.

April 17, 2024, at the address listed for him in his most recent Address Change Notice.  *See* Docket Notation dated April 17, 2024; Doc. No. 15.

Objections were, therefore, due by May 6, 2024.  No objections were filed.  Thus, on May 13, 2024 (i.e., twenty-six (26) days after the filing of the R&R), this Court issued a Memorandum Opinion & Order and Judgment Entry adopting the Magistrate Judge's R&R, dismissing the Petition, and closing the case.  (Doc. Nos. 17, 18.)  The docket reflects that copies of the Memorandum Opinion and Order, and Judgment Entry, were mailed to Thomas at the address listed in his most recent Address Change Notice.

On May 28, 2024, Thomas filed a Motion for Relief from Judgment or Order pursuant to Fed. R. Civ. P. 60(b)(6).  (Doc. No. 19.)  Therein, Thomas asserted that he was not served with a copy of the R&R and that he only became aware of the R&R and this Court's Memorandum Opinion & Order when he searched the prison's Nexus Lexis "legal app." (*Id*. at p. 2.)  He asked that the Court either allow him to file Objections, grant the Petition, or grant a Certificate of Appealability.  (*Id*. at p. 3.)  Respondent filed a Brief in Opposition on June 12, 2024.  (Doc. No. 20.)

On June 14, 2024, this Court granted Thomas's Motion for Relief from Judgment and vacated its May 13, 2024 Memorandum Opinion & Order and Judgment Entry.  (Doc. No. 21.)  The Court granted Thomas additional time within which to file Objections to the R&R, which he ultimately did on July 2, 2024.  (Doc. No. 25.)  Respondent did not file a Response to Thomas's Objections.

### III.    Standard of Review

 When a petitioner objects to a magistrate judge's resolution of a dispositive matter, the district court reviews those objections *de novo*.  Fed. R. Civ. P. 72(b)(3).  Specifically, a district judge:

> must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the

recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id*. "A party who files objections to a magistrate [judge]'s report in order to preserve the right to appeal must be mindful of the purpose of such objections: to provide the district court 'with the opportunity to consider the specific contentions of the parties and to correct any errors immediately.'" *Jones v. Moore*, 2006 WL 903199 at * 7 (N.D. Ohio April 7, 2006) (citing *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981)). An objection "that merely restates the arguments previously presented" or "does nothing more than state a disagreement with a magistrate's recommendation" is not sufficient. *Id*.

When a party fails to raise a specific objection to a finding of a magistrate judge on a dispositive matter, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. 72(b)(3), Advisory Committee Notes. *See also Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.")

## IV. Legal Standards regarding AEDPA Petitions

### A. Standard of Review for Claims Reviewed on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. The relevant provisions of AEDPA provide:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court. *See Parker v. Matthews*, 567 U.S. 37 (2012); *Renico v Lett*, 559 U.S. 766 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Shimel v. Warren*, 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Moreover, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 567 U.S. at 48-49. *See also Lopez v. Smith*, 574 U.S. 1, 4 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshall v. Rodgers*, 569 U.S. 58 (2013)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. *See also Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018). By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel,* 838 F.3d at 695. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the

10

relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id*. at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id*. at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *Id*. at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

## B.    Procedural Default

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to

review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).  A claim may become procedurally defaulted in two ways.  *Id*.  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.; see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. [5]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  *See also Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted.[6]  *See Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Lundgren*, 440 F.3d at 763; *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")

---

[5] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. *Maupin,* 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39*; Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002).  "To inform this inquiry, we look to the last explained state court judgment." *Stojetz v. Ishee*, 892 F.3d 175, 191 (6th Cir. 2018) (internal quotation marks and citations omitted).

[6] This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle v. Isaac,* 456 U.S. 107, 125 n. 28 (1982). Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id.  See also Williams v. Anderson,* 460 F.3d at 806.

Where a petitioner has procedurally defaulted claims, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750.  Demonstrating cause requires showing that an "objective factor external to the defense impeded counsel's efforts to comply" with the state procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  *See also Gerth v. Warden, Allen Oakwood Corr. Inst.,* 938 F.3d 821, 830 (6th Cir. 2019).  "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (citing *United States v. Frady,* 456 U.S. 152, 170–71(1982)).  The miscarriage of justice exception requires a prisoner to present new reliable evidence showing that he is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 321, 324 (1995).

## V.      Analysis

### A.      Ground One: Confrontation Clause

In Ground One, Thomas argues that his rights under the Confrontation Clause of the Sixth Amendment were violated when the prosecution was permitted to introduce into evidence two written forms that the Confidential Informant ("CI") filled out after completing the controlled buys, even though the CI did not testify at trial.  (Doc. No. 1-2 at PageID# 17.)  Citing the Sixth Circuit's decision in *U.S. v. Cromer*, 389 F.3d 662 (6th Cir. 2004), Thomas asserts that even where "the defendant may have open[ed] the door to the testimonial statement[,] [it] does not rise to the level of misconduct and so will not cause a defendant to forfeit his confrontation rights."  (*Id*.)  Thomas raised this argument

on direct appeal, both to the state appellate court and the Supreme Court of Ohio.  (Doc. No. 10-1 at

PageID#s 105-120, 189.)

The state appellate court rejected Thomas's argument as follows:

{¶14} In his first assignment of error, Thomas argues that two of the State's Exhibits, which were used during re-direct of Detective Baldridge, violated the Confrontation Clause because the exhibits contained statements of the CI and the CI did not testify in this matter. Thomas acknowledges that his trial counsel did not object to the exhibits or the testimony related to them; nevertheless he argues that it was plain error to permit the introduction of State's Exhibits 24 and 25, and any testimony related to the exhibits.

Standard of Review

{¶15} Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "However, we review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97. "*De novo* review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm. of Ohio*, 64 Ohio St.3d 145, 147 (1992).

{¶16} However, because Thomas failed to raise a Confrontation Clause issue with respect to these particular exhibits, he has waived all but plain error. *State v. Shepherd*, 3d Dist. Hardon No. 6-19-02, 2020-Ohio-3915, ¶ 31, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 191; *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 65. "Crim. R. 52(B) governs plain-error review in criminal cases." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 55, citing *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). For this Court to recognize plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, ¶ 30, citing *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, ¶ 11, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642; *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13; Crim.R. 52(B). Moreover, "even when the minimum requirements have been met, a reviewing court should still be conservative in its application of plain-error review, reserving notice of plain error for situations involving more than merely theoretical prejudice to substantial rights." *Steele* at ¶ 30, citing *State v. Long*, 53 Ohio St.2d 91, 94 (1978). "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional

14

circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus.

Relevant Authority

{¶17} The Confrontation Clause to the Sixth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' " *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354 (2004), quoting the Confrontation Clause. *See also State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 34; *State v. McNeal*, 3d Dist. Allen No. 1-01-158, 2002-Ohio-2981, ¶ 43, fn. 13.

> The United States Supreme Court has interpreted [the Sixth Amendment right to confrontation] to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.

*Maxwell* at ¶ 34, citing *Crawford* at 53-54. The United States Supreme Court "did not define the word 'testimonial' but stated that the core class of statements implicated by the Confrontation Clause includes statements 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.* at ¶ 35, quoting *Crawford* at 52.

{¶18} "Only testimonial hearsay implicates the Confrontation Clause." *McKelton* at ¶ 185. " '[T]estimonial statements are those made for "a primary purpose of creating an out-of-court substitute for trial testimony." ' " *Id.*, quoting *Maxwell* at ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143 (2011). That is, "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 2714 (2011), fn. 6, quoting *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266 (2006). "The key issue is what constitutes a testimonial statement: 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.' " *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶ 33, quoting *Davis* at 821. Nevertheless, "[t]here is also no dispute that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *State v. Ricks,* 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 18, quoting *Crawford* at 59, and citing *Williams v. Illinois*, 567 U.S. 50, 57-58, 132 S.Ct. 2221 (2012).

Analysis

15

{¶19} In this case, while Detective Baldridge was testifying, defense counsel cross-examined him about the CI. When questioned by defense counsel, Detective Baldridge acknowledged that the CI had prior felony convictions for drug trafficking, and that the CI had a pending felony case that was dismissed after the controlled buys were completed. Detective Baldridge also acknowledged that he had the CI sign a contract and that the CI was working for money in this case.

{¶20} Detective Baldridge was also cross-examined about "debriefings" that were held between the detective and the CI immediately following the controlled buys. During those debriefings, the CI claimed he purchased the drugs from Thomas. In addition, during the debriefing between Detective Baldridge and the CI following the May 15, 2019 controlled buy, the CI claimed to have never bought drugs from Thomas before, that he had never seen Thomas sell drugs to other individuals, and that he had never seen Thomas use drugs. Further, the CI also stated there was another person in the vehicle. Defense counsel pointed out that the CI's statement that at least one other person was in the vehicle was contrary to the testimony from one of the officers who observed the minivan after the controlled buy.

{¶21} Then, Detective Baldridge was cross-examined regarding his debrief with the CI after the May 23, 2019, controlled buy. The CI stated that the target was wearing "jeans" and a "tee," but the CI did not mention a hat. Defense counsel pointed out that when the driver of the minivan was photographed shortly after the controlled buy, the driver was wearing a hat, which could conflict with the CI's description of who had sold him the drugs.

{¶22} Defense counsel then asked if the CI was asked the same general questions by Detective Baldridge during the second debriefing, and Detective Baldridge testified that the questions were on a written form, so they were the same questions asked every time, and the questions were filled out by the CI. Defense counsel asked Detective Baldridge about the CI's responses on the written forms, pointing to some inconsistencies in the CI's statements. Detective Baldridge acknowledged that on the form following the May 15, 2019 controlled buy, the CI indicated he had known Thomas for 4-5 weeks and that he knew him from jail, whereas after the May 23, 2019, controlled buy the CI indicated he had known Thomas for a "couple months" and that he knew him from a friend. Defense counsel argued that these statements on the forms on the two different dates were inconsistent.

{¶23} On re-direct, following defense counsel's questioning regarding the debriefing between Detective Baldridge and the CI, the State introduced into evidence the written forms that the CI had filled out after the May 15, 2019, and May 23, 2019, controlled buys. Many of the questions on the forms had already been covered by defense counsel on cross-examination, but the form also asked such things as "Who did you buy the drugs from?"; "Who did you give the money to?"; and "Who gave you the drugs?" On both forms, the CI responded "Sonny" to all these questions. The forms from each

buy, which Detective Baldridge testified were kept in the regular course of business, were introduced into evidence as State's Exhibit 24 and State's Exhibit 25 respectively.

{¶24} On appeal, Thomas now argues that it was plain error to permit the introduction of State's Exhibits 24 and 25 and that it was plain error to permit any of the accompanying testimony related to those exhibits. He contends that the statements, particularly those identifying "Sonny" as the drug trafficker, effectively permitted the CI to testify without taking the witness stand.

{¶25} At the outset of our review, we note that the State correctly argues in its brief to this Court that the testimony about issues contained specifically within the debriefing forms (State's Exs. 24, 25), was initiated and emphasized by the defense on cross-examination, thus "opening the door" to the State on this topic. It is well settled that "a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Smith v. O'Connor*, 71 Ohio St.3d 660, 663, 646 N.E.2d 1115 (1995).

{¶26} Notwithstanding this point, the evidence that Thomas now finds most objectionable is entirely duplicative of statements made otherwise in the record indicating that Thomas was the individual committing drug trafficking. Thomas complains that State's Exhibits 24 and 25 contain statements that "Sonny" sold the drugs; however, officers testified regarding the set-up to the controlled buy through the phone call with Thomas, the minivan used for the transaction that was registered to Thomas, the observations of Thomas in the minivan after the CI made the purchases, and the knowledge of officers that Thomas went by the street name of "Sonny." Thus the statements on the form are cumulative to other evidence in the record. *State v. Edwards,* 9th Dist. No. 28164, 2017-Ohio-7231, 96 N.E.3d 890, ¶ 42, citing *State v. Williams,* 38 Ohio St.3d 346, 350, 528 N.E.2d 910 (1988) (the erroneous admission of hearsay, cumulative to the testimony of other witnesses at trial, constitutes harmless error, a lower standard than the case before us); *State v. Hernon,* 9th Dist. Medina No. 3081–M, 2001 WL 276348, *4 (March 21, 2001) (noting that error in admitting testimony may be harmless beyond a reasonable doubt if it is cumulative); *see also State v. Baskin,* 3d Dist. Allen No. 1-18-23, 2019-Ohio-2071. Because the evidence on the forms is cumulative to other evidence in the record, we could not find error here, let alone plain error.

{¶27} In arguing that his case should be reversed, Thomas cites *United States v. Cromer,* 389 F.3d 662 (6th Cir. 2004), wherein some specific statements of a CI were found to be testimonial and reversible when the CI did not testify at trial. However, the Sixth Circuit Court of Appeals later acknowledged that violations of the Confrontation Clause are subject to "harmless error" review, and where other testimony satisfies the conviction, an error is harmless. *See U.S. v. Powers,* 500 F.3d 500 (6th Cir. 2007). Ohio Courts have similarly applied a harmless error review when discussing constitutional issues like the Confrontation Clause when there is an

17

objection to evidence. *See State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶¶ 43-50. Harmless error is a lower standard than plain error, and Thomas cannot meet this lower standard, let alone the higher plain error standard due to the nature of the evidence in this case. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 15 (stating that harmless error is a standard significantly more favorable to the defendant). Based on the evidence presented we cannot find plain error in this case. Therefore, Thomas's first assignment of error is overruled.

*Thomas*, 2020 WL 6852650 at * 2-6.

## 1.     Procedural Default

In the R&R, the Magistrate Judge found that Thomas procedurally defaulted his Confrontation Clause claim. The Magistrate Judge first concluded that Ground One is defaulted because Thomas failed to object to the prosecution's introduction of the written forms during trial. (Doc. No. 16 at pp. 14-15.) The Magistrate Judge correctly noted that:

> Ohio adheres to the "contemporaneous objection" rule, pursuant to which a defendant who fails to contemporaneously object to an alleged trial error waives appellate review of the issue unless the defendant demonstrates plain error. *See Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004). As the Sixth Circuit has repeatedly held, "Ohio's contemporaneous objection rule is an independent and adequate ground to foreclose relief absent a showing of cause and prejudice." *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) ("Failure to adhere to the 'firmly established Ohio contemporaneous objection rule' is 'an independent and adequate state ground' of decision.") (quoting *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006)).

> The Third Appellate District enforced the contemporaneous objection rule here, holding that, because Mr. Thomas did not object to introduction of the two exhibits at trial, its review was limited to plain error. (ECF No. 10-1, Exhibit 21, ¶ 16). The Ohio Supreme Court then declined to accept jurisdiction over Mr. Thomas' appeal without comment, leaving the Third Appellate District's ruling as the last reasoned decision on the issue. *See Ylst*, 501 U.S. at 805.

> It is well-settled that an Ohio court enforces the contemporaneous objection rule for purposes of *Maupin* when it conducts plain error review on appeal. *See Wickline v. Mitchell*, 319 F.3d 813, 823 n.5 (6th Cir. 2003) ("The Ohio Supreme Court's review for plain error constitutes enforcement of this procedural rule, which this court has recognized as an adequate and independent state ground barring federal habeas review."); *Dudas v. Gansheimer*, No. 1:09CV1177, 2010 WL 9038323, at *15 (N.D.

Ohio Oct. 1, 2010), report and recommendation adopted, 2012 WL 5931783 (N.D. Ohio Nov. 27, 2012) ("The court proceeded to conduct a plain error analysis, but a plain error review by a state court does not constitute a waiver of the state court's procedural bar.").

(*Id*.) The Magistrate Judge also found that Ground One is defaulted under Ohio's "invited error" doctrine because the state appellate court applied that doctrine when it held that Thomas invited any Confrontation Clause error when his counsel asked Detective Baldridge questions on cross-examination about alleged inconsistencies in the CI's statements in the two written forms that were admitted as State's Exhibits 24 and 25.  (*Id*. at pp. 15-16) (citing cases).

The Magistrate Judge explained that Thomas's procedural default could nonetheless be excused if he could demonstrate either cause and prejudice, or that failure to consider the claim would result in a fundamental miscarriage of justice.  (*Id*. at p. 16.)  The Magistrate Judge acknowledged Thomas's argument, in his Traverse, that his procedural default should be excused because his trial counsel provided ineffective assistance of counsel in failing to object to the prosecution's introduction of the two forms or the prosecution's questions regarding them.  (*Id*.)  The Magistrate Judge found, however, that, for the reasons discussed in the R&R in connection with Ground Two, Thomas had not established that he received constitutionally ineffective assistance of counsel.  (*Id*. at p. 17.)  The Magistrate Judge further found that "Mr. Thomas also does not argue that he has presented new evidence showing that he is actually innocent of the crimes for which he was convicted." (*Id*.)

Notably, Thomas does not object to the Magistrate Judge's conclusion that Ground One is procedurally defaulted under Ohio's contemporaneous objection rule.  Nor does Thomas argue, in his Objections, that the Magistrate Judge improperly concluded that he had failed to argue his default should be excused on actual innocence grounds and/or that there is new evidence showing that he is

actually innocent. Thus, having failed to raise these arguments in his Objections, the Court reviews the Magistrate Judge's conclusions on these issues for clear error.

Upon careful review, the Court finds no clear error and agrees with the Magistrate Judge that Ground One is procedurally defaulted under Ohio's contemporaneous objection rule because (1) Thomas's trial counsel failed to object to the prosecution's introduction of Exhibits 24 and 25 at trial; (2) Ohio's contemporaneous objection rule is an independent and adequate ground to foreclose relief absent a showing of cause and prejudice; and (3) the state appellate court enforced the contemporaneous objection rule when it held that, because Mr. Thomas did not object to introduction of the two exhibits at trial, its review was limited to plain error. *See Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017); *White v. Miller*, 431 F.3d 517, 525 (6th Cir. 2005); *Pippins v. Warden, North Central Correctional Institution*, 2024 WL 4700390 at * 3 (6th Cir. Oct. 1, 2024). [7]

As noted above, however, a petitioner may avoid procedural default "by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). Constitutionally ineffective assistance of counsel may constitute cause for a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

Construed liberally, Thomas's Objections could be construed as asserting that his trial counsel's alleged ineffectiveness in failing to object to the State's introduction of Exhibits 24 and 25 constitutes cause and prejudice to excuse the procedural default of Ground One. Like the Magistrate

---

[7] Thomas's Objections could be construed as challenging the Magistrate Judge's conclusion that Ground One is procedurally defaulted under the invited error doctrine. (Doc. No. 25 at PageID# 1110-1111.) However, as the Court finds no clear error in the Magistrate Judge's conclusion that Ground One is procedurally defaulted under Ohio's contemporaneous objection rule, the Court need not (and will not) address Thomas's arguable objection regarding the invited error doctrine.

Judge, the Court concludes, for all the reasons discussed at length *infra* in Section V.B of this Opinion, that the state appellate court's determination that Thomas's trial counsel was not ineffective was neither an unreasonable application of, nor contrary to, clearly established United States Supreme Court case law. Accordingly, the Court agrees with the Magistrate Judge that Ground One of Thomas's Petition is procedurally defaulted and, further, that Thomas has filed to establish cause or prejudice to excuse the default. The Court therefore finds that Ground One is subject to dismissal on the grounds that it is procedurally defaulted.

## 2. Merits

Although the Magistrate Judge found (and this Court agrees) that Ground One should be dismissed as procedurally defaulted, the Magistrate Judge nonetheless went on to address, in the alternative, the merits of Thomas's Confrontation Clause claim. (Doc. No. 16 at pp. 17-22.) The Magistrate Judge noted that "Mr. Thomas' argument that this case is akin to [the Sixth Circuit's decision in] *Cromer* is not without some force, and I might agree with him if this were before me on direct review." (*Id.* at p. 19.) However, the Magistrate Judge found that, even assuming the CI's statements at issue herein were "testimonial" for Confrontation Clause purposes, it was not unreasonable for the state appellate court to conclude that the introduction of the two CI forms was harmless. (*Id.*) Specifically, the Magistrate Judge concluded that it was not contrary to or an unreasonable application of controlling law for the state appellate court to find that the CI's statements identifying Thomas were "at least arguably cumulative to other evidence that also identified Mr. Thomas as the individual who sold the confidential informant drugs." (*Id.* at p. 21.) Such evidence, the Magistrate Judge noted, included "testimony from police officers regarding the phone calls with Mr. Thomas to set up the controlled buys, the fact that the vehicle in which the drugs

were sold was registered to Mr. Thomas, and testimony that Mr. Thomas was observed in the van after the confidential informant made the purchases." (*Id.* at pp. 21-22.)

In his Objections, Thomas argues that "it was plain error for the prosecution to introduce the evidence of the written forms." (Doc. No. 25 at p.2.) He asserts that neither of the police officers involved actually saw any transaction take place between Thomas and the CI and argues that "the CI is the only witness that can connect the petitioner to the crime charged in which the CI did not testify at trial." (*Id.*) Thomas maintains that the introduction of the CI forms "was not harmless and that it was in fact plain error and that it had a substantial influence on the defendant['s] conviction." (*Id.* at p. 3.) Thomas asserts that the evidence of the alleged phone calls with Thomas are not cumulative because "the prosecutor never made any connection nor set any foundation as to who was on the receiving end of the phone call or made a connection regarding who the phone number was registered to." (*Id.*) He also argues that the fact that the vehicle was registered to him does not demonstrate that he sold any drugs to the CI. (*Id.*) Thus, Thomas asserts that the admission of the CI forms was plain error and the Magistrate Judge erred in concluding otherwise. (*Id.* at p. 6.)

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). It operates independently from the hearsay rule. *Id.* at 50–51. Statements are "testimonial" "when the circumstances objectively

indicate ... that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," rather than to enable the assistance of law enforcement to respond to an ongoing emergency. *Davis v. Washington*, 547 U.S. 813, 822 (2006).

Here, the state appellate court first determined that because Thomas failed to raise a Confrontation Clause issue with respect to the introduction of the CI forms at issue, he had waived all but plain error. *Thomas*, 2020 WL 6852650 at * 3. The state appellate court then found no plain error because the evidence on the CI forms was cumulative to other evidence in the record showing that "Thomas was the individual committing drug trafficking," including (1) officers' testimony regarding the set-up to the controlled buy through the phone call with Thomas; (2) evidence that the minivan used for the transaction was registered to Thomas; (3) testimony that Thomas was in the minivan after the CI made the purchases; and (4) officers' testimony that Thomas went by the street name of "Sonny." *Id.* at *5. The state appellate court then went on to reject Thomas' reliance on *Cromer* and find that any error in the admission of the CI forms was harmless error, explaining as follows:

> In arguing that his case should be reversed, Thomas cites *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), wherein some specific statements of a CI were found to be testimonial and reversible when the CI did not testify at trial. However, the Sixth Circuit Court of Appeals later acknowledged that violations of the Confrontation Clause are subject to "harmless error" review, and where other testimony satisfies the conviction, an error is harmless. *See U.S. v. Powers*, 500 F.3d 500 (6th Cir. 2007). Ohio Courts have similarly applied a harmless error review when discussing constitutional issues like the Confrontation Clause when there is an objection to evidence. *See State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶¶ 43-50. **Harmless error is a lower standard than plain error, and Thomas cannot meet that lower standard, let alone the higher plain error standard due to the nature of the evidence in this cas**e. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 15 (stating that harmless error is a standard significantly more favorable to the defendant). Based on the evidence presented we cannot find plain error in this case.

*Id.* (emphasis added).

23

Both the United States Supreme Court and the Sixth Circuit have held that Confrontation Clause violations are subject to harmless-error analysis. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020). And, as the Magistrate Judge correctly noted, a state court's harmless error determination qualifies as an adjudication on the merits under AEDPA. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022). It follows, then, that "[w]hen a state court determines that a constitutional error at trial is harmless beyond a reasonable doubt, a federal court cannot grant habeas relief without applying both the [harmless error] test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993),[8] and the deferential review required by AEDPA." *Wright v. Schiebner*, 2024 WL 4785773 at * 2 (6th Cir. 2024) (citing *Brown*, 596 U.S. 118 at 122). In short, a "federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petitioner has cleared both tests." *Brown*, 596 U.S. at 134. *See also Wright*, 2024 WL 4785773 at * 2.

Here, and upon careful review, the Court agrees with the Magistrate Judge that the state appellate court's harmless error analysis was not contrary to or an unreasonable application of clearly establish federal law under AEDPA. As the state court correctly noted, the State introduced evidence at trial that Thomas negotiated and set up both the May 15, 2019 and May 23, 2019 controlled buys with the CI, and was physically present at the agreed-upon locations for both buys. Specifically, Detective Baldridge (who was the CI's "handler") testified that, to set up the May 15, 2019 buy, the

---

[8] *Brecht* requires a state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect or influence" means "actual prejudice" as a result of the error. *Brecht*, 507 U.S. at 637-38. *See also Reiner*, 955 F.3d at 555. This standard is met when a federal court "is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch* 513 U.S. 432, 436 (1995) (citation and internal quotation marks omitted). "[G]rave doubt [ ] mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435 (internal quotation marks omitted).

CI called Thomas while the CI was with Detective Baldridge in a vehicle near the park. (Trial Tr. (Doc. No. 10-2) at Tr. 376-378.) Detective Baldridge listened to the call as it was occurring and recorded it. (*Id*. at Tr. 377-379.) The call was played for the jury at Thomas' trial. (*Id.* at Tr. 389-396.) Detective Baldridge testified that he was familiar with Thomas's voice prior to the call, and that he was certain that it was Thomas on the phone with the CI. (*Id.* at Tr. 379-380.) Detective Baldridge testified that, after the call, he conducted a search of the CI (during which he did not find any drugs) and dropped the CI off near the park, which was the location where the CI and Thomas had agreed to meet. (*Id*. at Tr. 396-398.)

Detective Baldrige then lost sight of the CI. (*Id*. at Tr. 402.) However, Officer Stacy McCoy was assigned to surveillance and in an undercover vehicle near the park on May 15, 2019. (*Id*. at Tr. 232-233.) Officer McCoy testified that she watched the CI walk around the park and observed a blue minivan approach the CI. (*Id*. at Tr. 236-237.) Officer McCoy testified that she did not clearly see the driver of the blue minivan, but that she knew that the minivan was registered to Thomas. (*Id*. at Tr. 259, 237.) Officer McCoy saw the CI get in the minivan, after which the van drove out of McCoy's sight for approximately 25 seconds before returning. (*Id*. at Tr. 238.) Officer McCoy testified that she then saw the minivan return to the park and the CI get out of the minivan. (*Id*. at Tr. 244.) Officer McCoy took a video recording of the buy with a handheld camera, which was played for the jury. (*Id*. at Tr. 239-245.)

Lieutenant Chris Adkins was also assigned to surveillance for the May 15, 2019 controlled buy and was near the park in an undercover vehicle. (*Id*. at Tr. 271-272.) Lieutenant Adkins testified that he saw the CI get in the blue minivan and that he took several photographs of the van, which were shown to the jury. (*Id.* at Tr. 282-286.) Lieutenant Adkins testified that he momentarily lost

sight of the van.  (*Id*. at Tr. 286.)  However, he testified that he saw the CI get out of the van once the van returned to the park.  (*Id*. at Tr. 287.)  Lieutenant Adkins testified that he then followed the van for about three to five minutes, in order to try to get a photo of the driver.  (*Id*. at Tr. 287-289, 294.) Lieutenant Adkins explained that he drove past the van and, although he did not take a photograph, he was able to see through the window and identify Thomas as the driver.[9] (*Id*. at Tr. 289-290.) Lieutenant Adkins further testified that nobody else was in the van.  (*Id*. at Tr. 290.)

Detective Baldridge testified that, after the buy, he saw the blue minivan and took several photographs of it, which were shown to the jury.  (*Id*. at Tr. 402-403, 443-450.)  Detective Baldridge explained that he then picked up the CI, searched him, and collected the drugs.  (*Id*. at Tr. 406.)  He testified that the type and price of drugs retrieved from the CI (i.e., 1.6 grams of heroin) was consistent with the type and price of drugs that had been discussed and agreed upon during the telephone call between the CI and Thomas that day.  (*Id*. at Tr. 406-408.)  In addition, Detective Baldridge testified that he "debriefed" the CI and had the CI fill out three forms relating to the controlled buy.  (*Id*. at Tr. 407.)

The State introduced similar testimony and evidence regarding the May 23, 2019 controlled buy.  Detective Baldridge testified that, like the previous buy, the CI called Thomas while the CI was with Detective Baldridge in a vehicle near the park.  (*Id*. at Tr. 411-412.)  Detective Baldridge listened to the call as it was occurring and recorded it.  (*Id*.)  The call was played for the jury.  (*Id.* at Tr. 412-416.)  Detective Baldridge again testified that he was familiar with Thomas's voice prior to the call, and that he was certain that it was Thomas on the phone with the CI.  (*Id.* at Tr. 412-413.)  Detective

---

[9] Lieutenant Adkins testified that he was familiar with Thomas prior to the May 15, 2019 buy and that Thomas was "absolutely driving that car."  (*Id.* at Tr. 277, 296-297.)

Baldridge testified that, after the call, he conducted a search of the CI (during which he did not find any drugs), dropped the CI off near the park, and watched the CI walk to the park.  (*Id*. at Tr. 417-419.)

Detective Baldridge further testified that, unlike the May 15, 2019 buy, the May 23, 2019 buy was captured by audio and video recording devices that had been placed on the CI.  (*Id*. at Tr. 423-425.)  Detective Baldridge listened to the buy as it was occurring, and the audio/video recording was played to the jury.  (*Id*. at Tr. 420, 423-425, 428-431.)  As demonstrated by the video recording, the CI waited in the park for about 20 minutes or so before a blue minivan approached.  (*Id*. at Tr. 429-431.)  Detective Baldridge testified that the video was significant because it showed that "Johnny Thomas is in the van."  (*Id*. at Tr. 430-431, 432.)  Detective Baldridge then testified that the CI was in the van for "a minute, at best" before exiting the van.  (*Id*. at Tr. 431.)

Officer McCoy testified that she was assigned to surveillance and in an undercover vehicle near the park on May 23, 2019.  (*Id*. at Tr. 246-247.)  Officer McCoy testified that she took a video recording (which was played to the jury) and that she was also able to listen in on the transaction as it was occurring.  (*Id*. at Tr. 247-252.)  Officer McCoy testified (and the video recording showed) the blue minivan approach the park.  (*Id*. at Tr. 249.)  Officer McCoy testified that this was the same blue minivan that was involved in the May 15, 2019 buy and confirmed that it was registered to Thomas. (*Id.*)  Officer McCoy further testified that the van was out of her sight for about one minute, before it returned and the CI got out of the van. (*Id*. at Tr. 249- 254.)  After the CI had exited the van, Officer McCoy followed the van and observed Thomas get out of the driver's side door.  (*Id*. at Tr. 254-255, 265-267.) Officer McCoy further testified that she did not see anybody else in the van.  (*Id*. at Tr. 255, 267.)

27

In addition, Detective Baldridge testified that, after the buy, he picked up the CI, searched him, and collected the drugs. (*Id*. at Tr. 421, 431-432.) He testified that the amount and type of drugs retrieved from the CI (i.e., 6.1 grams of heroin) was consistent with the amount and type of drugs that had been discussed and agreed upon during the telephone call between the CI and Thomas earlier that day. (*Id*. at Tr. 414, 422.) In addition, Detective Baldridge testified that he "debriefed" the CI and had the CI fill out three forms relating to the controlled buy. (*Id*. at Tr. 421.)

Applying AEDPA deference, the Court finds that it was not contrary to or an unreasonable application of clearly established federal law for the state appellate court to determine that the evidence on the CI debriefing forms (i.e., the CI's statement on the forms that he bought the drugs on May 15 and 23, 2019 from Thomas, aka "Sonny") is cumulative to the evidence set forth above. Although none of the officers testified that they personally saw Thomas sell the heroin to the CI, the State introduced testimony and evidence that: (1) Thomas participated in telephone calls with the CI on May 15 and 23, 2019 during which he negotiated the time and place of the buys, as well as the amount and price of the heroin that was being sold; (2) a blue minivan that is registered to Thomas appeared at the agreed-upon location at the agreed-upon time and date on both May 15, 2019 and May 23, 2019 and the CI was seen entering that van on both dates; (3) Lieutenant Adkins saw Thomas driving the blue minivan shortly after the May 15, 2019 buy; (4) Officer McCoy saw Thomas driving the blue minivan shortly after the May 23, 2019 buy; (5) Officer McCoy and Lieutenant Adkins did not see anyone else in the van during either the May 15, 2019 or May 23, 2019 buys; and (6) Detective Baldridge searched the CI immediately after both buys and recovered drugs in the type and amounts that were agreed upon during the May 15, 2019 and May 23, 2019 phone calls. The state appellate court accurately characterized the above evidence and the Court cannot say that it was unreasonable

for that court to find that it was cumulative to the evidence on the CI forms.  In light of the cumulative nature of the evidence, the Court further finds that it was neither unreasonable nor contrary to clearly established federal law for the state appellate court to determine that any error in the admission of the CI forms was harmless.[10]

Accordingly, and for all the reasons set forth above, the Court finds that Ground One is both procedurally defaulted and fails on the merits.  Thomas' first Ground for Relief is, therefore, denied.

## B.    Ground Two: Ineffective Assistance of Trial Counsel

In Ground Two, Thomas argues that his trial counsel was ineffective because counsel failed to object on Confrontation Clause grounds to the State's introduction of the CI forms (i.e., State's Exhibits 24 and 25) and Detective Baldridge's testimony relating thereto.  (Doc. No. 1 at PageID# 7.)  The state appellate court considered this claim on the merits and rejected it, as follows:

> {¶28} In his second assignment of error, Thomas argues that he was denied the effective assistance of counsel. Specifically, he argues that his trial counsel was ineffective for failing to object to the introduction of State's Exhibits 24 and 25 discussed in the previous assignment of error and the testimony accompanying these exhibits.
>
> Standard of Review
>
> {¶29} "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez*, 3d Dist. Defiance Nos. 4-16-27, 28, 2017-Ohio-2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1-15-43, 2016-Ohio-3105, ¶ 11, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same

---

[10] Because the Court finds that Thomas has failed to satisfy the test under AEDPA, it need not (and will not) evaluate whether he can satisfy the *Brecht* test as well.  *See Brown*, 596 U.S. at 134 (holding that a "federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA") (emphasis added). *See also Wright*, 2024 WL 4785773 at * 2 (same).

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Analysis

{¶30} We have already determined that there was no outcome-determinative error made in this case in the admission of State's Exhibits 24, 25, and the accompanying testimony. Thus Thomas is unable to demonstrate prejudice in this matter and his assignment of error fails for this reason alone.

{¶31} Nevertheless, it is clear from a review of the record that defense counsel was employing a strategy to attempt to establish 'doubt' in this matter through the use of the evidence contained in State's Exhibits 24 and 25, wherein the CI made some arguably conflicting statements, including at least one statement that conflicted with the testimony of another officer. We will not find ineffective assistance of counsel based on trial strategy merely because it was unsuccessful. *See also State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, ¶ 18 ("Questionable trial strategies and tactics, however, do not rise to the level of ineffective assistance of counsel.").

{¶32} Here, defense counsel had to defend a case where Thomas was heard on the phone setting up a drug deal, his vehicle was observed picking up the CI, Thomas was subsequently observed in the vehicle, and the CI returned from his interactions in the vehicle with drugs essentially in the amount he had agreed to buy on the phone from Thomas. Trial counsel tried to sow doubt where he could and we will not find his strategy ineffective because it was not successful in a case with such substantial evidence establishing Thomas's guilt. For all of these reasons, Thomas's second assignment of error is overruled.

*Thomas,* 2020 WL 6852650 at * 6.

In the R&R, the Magistrate Judge found that it was not unreasonable for the state appellate court to conclude that trial counsel "was employing a reasonable trial strategy in pointing to inconsistencies in the confidential informant's statements in the written forms in an attempt to create reasonable doubt about Mr. Thomas' guilt, despite the unfavorable information contained in those documents."  (Doc. No. 16 at p. 24.)  The Magistrate Judge further found that, even if trial counsel was ineffective in failing to object to the introduction of the CI forms, the state appellate court did not act contrary to or unreasonably apply controlling law in concluding that Thomas was not

prejudiced in light of the arguably cumulative nature of that evidence and the other evidence of Thomas's guilt.  (*Id*.)

Thomas objects to the Magistrate Judge's conclusions.  (Doc. No. 25 at PageID#s 1112-1113.) He argues that his trial counsel's performance was inadequate because "trial counsel knew or should have known that the [CI] statements that were introduced were in fact testimonial."  (*Id*. at PageID# 1113.)  Thomas further asserts that he was prejudiced by trial counsel's failure to object because "the out-of-court statement[s] [were] in fact the only evidence that implicated the petitioner to the sale of drugs and had his trial counsel objected, those statements implicating petitioner to the crime … may not have been [admitted] during [his] trial."  (*Id*. at PageID# 1112.)  Thomas insists that "such out-of-court statements were the only alleged evidence that was improperly introduced that states that the petitioner allegedly sold drugs to a CI" and that admission of the CI forms "likely impacted the outcome of the trial."  (*Id*. at PageID# 1113.)

For the following reasons, the Court finds Thomas's Objections to be without merit.  The state appellate court's decision was neither an unreasonable application of, nor contrary to, clearly established United States Supreme Court case law.  The state appellate court correctly identified and laid out the two-prong test under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a defendant to demonstrate that (1) his counsel's performance was deficient, and (2) he was prejudiced as a result.  *See Strickland*, 466 U.S. at 687.

Because the state appellate court herein decided Thomas's ineffective assistance of counsel claim on the merits, "AEDPA adds another layer of deference to our review."  *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (citing 28 U.S.C. § 2254(d)(1)).  This means that this Court's review of the state court's adjudication of Thomas's ineffective assistance claim must be "doubly

31

deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  "The question 'is not whether a federal court believes the state court's determination' under *Strickland* 'was incorrect[,] but whether [that determination] was unreasonable—a substantially higher threshold.'" *Id*. (quoting *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)).  To qualify as "unreasonable," the state court's adjudication of the claim must have been "so lacking in justification" that it amounts to "an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Richter*, 562 U.S. at 103.  *See also Hendrix*, 893 F.3d at 922.

Here, the Court finds that it was not contrary to, or an unreasonable application of, clearly established federal law for the state appellate court to conclude that Thomas failed to satisfy the first element of the *Strickland* test,  i.e., that his trial counsel's performance fell below an objective standard of reasonableness.  As the Supreme Court and the Sixth Circuit have explained, Thomas cannot meet this prong of the *Strickland* test "simply by showing that the lawyers' decisions 'deviated' from the 'best' or 'common' course." *Fields v. Jordan*, 86 F.4th 218, 240 (6th Cir. 2023) (quoting *Richter*, 562 U.S. at 105).  Rather,  trial counsel's decisions must have reached such a level of "incompetence" that Thomas lacked the "'counsel' guaranteed [him] by the Sixth Amendment." *Richter,* 562 U.S. at 104–05 (quoting *Strickland*, 466 U.S. at 687).  When deciding whether Thomas's counsel performed incompetently, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.  Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id*. at 690. *See also English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010).  However, even when making

strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores–Ortega*, 528 U.S. 470, 481 (2000). Importantly, in making this determination, this Court undertakes a "highly deferential" review of trial counsel's decisions, avoiding the unfair "hindsight" bias that often infects after-the-fact assessments. *Id. See also Fields,* 86 F.4th at 218.

Here, it was not contrary to, or an unreasonable application of, clearly established federal law for the state appellate court to conclude that it was a reasonable trial strategy for trial counsel to attempt to use the information contained in the CI forms to impeach the testimony of Detective Baldridge, Lieutenant Adkins, and Officer McCoy; cast doubt on the credibility of the CI; and/or otherwise create a reasonable doubt that it was, in fact, Thomas who actually sold the drugs to the CI on May 15, 2019 and May 23, 2019. For example, while Lieutenant Adkins testified that he did not see anyone else in the blue minivan when he drove past it on May 15, 2019, the CI indicated on the "debriefing" form for that buy that there were two other individuals in the van. (Doc. No. 10-2 at Tr. 290, 453.) Likewise, while Officer McCoy testified that she did not see anyone else in the minivan when she drove past it on May 23, 2019, the CI indicated on the "debriefing" form for that buy that there were two other people in the vehicle. (*Id*. at Tr. 255, 267, 462.) Additionally, during cross examination of Detective Baldridge, trial counsel pointed out several inconsistencies in the CI's answers on the two CI forms, including that, in one of the forms, the CI indicated that he knew Thomas "from jail" whereas, in the other form, the CI indicated that he knew Thomas "through a friend." (*Id*. at Tr. 461-462.)

Based on the above, and applying the doubly deferential standard of review under *Strickland* and AEDPA, the Court finds that it was not unreasonable for the state appellate court to conclude that Thomas had failed to show that his trial counsel's performance was deficient under the first prong of

*Strickland*. The Court further concludes that, given the evidence that was presented at trial and discussed *supra,* it was neither contrary to, nor an unreasonable application of, clearly established federal law for the state appellate court to conclude that Thomas failed to satisfy the second element of the *Strickland* test, i.e., that he was prejudiced as a result of his counsel's failure to object to the State's introduction of the CI forms and related testimony.

Accordingly, and for all the reasons discussed above, the Court finds that Thomas's Objections with regard to Ground Two are without merit and rejected. Ground Two of Thomas's Petition is, therefore, denied.

## VI.    Conclusion

For the foregoing reasons, Thomas's Objections (Doc. No. 25) are overruled, the Report & Recommendation (Doc. No. 16) is adopted as set forth herein, and the Petition (Doc. No. 1) is denied. In addition, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**


                                                              *s/Pamela A. Barker*
                                                         PAMELA A. BARKER
Date:  December 11, 2024                                  U. S. DISTRICT JUDGE